The case on our docket is 22-40043, Feds for Medical Freedom, Local 918 v. Biden. Scarborough. Good morning, Your Honors, and may it please the Court. Charles Scarborough, Department of Justice for the Government. The COVID-19 pandemic has inflicted enormous harms and continues to pose unprecedented challenges. It has especially disrupted American businesses and employers. Thus, when safe and effective vaccines became widely available, many employers not only encouraged but required their employees to be vaccinated. In September of last year, President Biden took the same approach. Acting in his capacity as CEO of the federal workforce, the President issued Executive Order 14043, which directs federal agencies to require that all current and new employees be vaccinated against COVID-19, subject to legally required exemptions from medical conditions or religious conventions. Prior to January, at least a dozen district courts had denied requests to enjoin the Executive Order, including in cases brought by some of the plaintiffs here or members of federal community. Nevertheless, on January 21st, the District Court issued a nationwide preliminary injunction prohibiting the implementation or enforcement of the Executive Order, effectively rendering all the other decisions meaningless. That injunction should be reversed for several reasons. First and foremost, the District Court lacked jurisdiction over plaintiffs' claims. Plaintiffs' standing to challenge the EO is based exclusively on the prospect of injury from future adverse personnel actions resulting from their refusal to comply with the vaccination requirement. But the Civil Service Reform Act channels challenges to the discipline of federal employees into the Merit Systems Protection Board with review in the federal circuit. In Elgin, the Supreme Court made clear that even a facial constitutional challenge to a federal statute must proceed exclusively in the CSRA scheme because it was the vehicle by which the plaintiffs there sought to reverse their removal decisions. That logic applies equally here, where plaintiffs' challenge to the EO is the vehicle by which they seek to prevent possible future removal. The District Court reasoned that because the CSRA generally doesn't allow pre-enforcement review, a pre-enforcement claim like this one isn't subject to CSRA preclusion. But that gets the law exactly backward. As this Court recently explained in Zomerview-Salot, the fact that plaintiffs can't obtain particular relief under the CSRA, in that case, review of a security clearance revocation, doesn't mean they are exempt from the CSRA. It simply means Congress chose not to provide the form of relief. As this Court put it, quote, any gaps in the CSRA's remedial scheme are intentional. They do nothing to upset its global exclusivity. Whereas then Judge Roberts put it in Fornaro, what you get under the CSRA is what you get. If employees could evade the CSRA simply by challenging employment policies before they have suffered any adverse action, that would create an enormous and easily exploitable loophole in the integrated scheme review Congress intended to create. Even if the District Court had jurisdiction, its ruling was wrong on the merits. In issuing the executive order, the President acted in his capacity as an employer, not as a regulator. In Nassau v. Nelson and other cases, the Supreme Court has long confirmed that the President has wide latitude in managing the federal workforce and a, quote, much freer hand in that capacity than in his regulatory capacity. That baseline authority under Article II means the relevant question here is not whether Congress authorized the President to establish conditions of employment, like a vaccination requirement, but whether Congress prohibited the President from exercising his inherent authority. It did not. On the contrary, in 5 U.S.C. 3301, 3302, and 7301, Congress expressly confirmed the President's broad authority to prescribe rules for the admission to the federal service and for the conduct of federal employees. Numerous Presidents have invoked those authorities as the basis for imposing restrictions on to submit to detailed background checks, abstain from on or off-duty drug use, avoid financial conflicts of interest, and refrain from certain forms of political participation. Even if the District Court were right on the merits, it misapplied the equitable factors. No plaintiff here is certain to be imminently discharged for refusing to comply with a vaccination requirement, and even if he were, the Supreme Court and this Court have repeatedly held that such employment-related harms are not irreparable. On the other side of the ledger, the injunction prevents the President from implementing the same reasonable measures to mitigate disruption from COVID-19 in the workforce that many private employers have adopted. Finally, even if the District Court were right about all these other points, it was plainly incorrect to enter a nationwide injunction. As numerous judges and justices have recognized, both Article III and general principles of the Constitution are injunctions no broader than necessary to provide relief to prevailing plaintiffs. But despite purporting to recognize these principles, the District Court essentially threw up its hands and declared that it was not practical to tailor relief more narrowly. Because the Court could have fully remedied plaintiffs' asserted injuries by granting relief limited to the individual plaintiffs and existing members of Feds for Medical Freedom, the injunction should, at a minimum, be narrow to that scope. If the Court agrees on this point or any others, it should immediately grant the government's renewed stay motion, which was pending before the panel at the time the Court granted rehearing en banc. I welcome the Court's questions. Does the President have constitutional power to remove any employee of the Executive Branch? Power to remove? The President, acting through agencies, yes, subject to some constraints. Merit systems constraints, constraints on, you know, discrimination, as, you know, in the Anti-Discrimination Statute. So there are, there are constraints on the President's authority, and we've never contended otherwise. I, and I, you know, the plaintiffs say periodically we haven't challenged the constitutionality of the CSRA. That, that's, we, that's absolutely right. We have not. We subscribe to the CSRA. We believe the CSRA confirms the President's broad authority in a variety of different ways. So under the CSRA, you either have to do cause or pass a regulation that is consistent with the CSRA. That's your, that's your theory? Yes. What do you do with the, the BST Holdings case? First, does the Department of Justice take the position that, that that case is fine as is, or does the en banc court need to refine or explain it in any way or even overrule    it? Uh, and irrespective of what you might say about that, uh, given that, uh, decision as it stands, uh, how, how do you grapple with that in terms of this case? Sure. Well, I assume Your Honor is referring to the, uh, discussion of irreparable harms, which is very brief in the BST Holdings case. It was just two sentences, and it cited the Elrod versus Burns case for the proposition that, you know, constitutional injury, a, a deprivation of constitutional rights for even a small amount of time is by definition irreparable injury. Um, there's a number of ways we distinguish that, that holding here. There, there's no constitutional claims in this case. Um, and we also, uh, I, I think just more generally believe it's distinguishable in the sense that that case involved a peculiar circumstance in which it was not clear that the employees that were being referred to there as, as suffering irreparable harm had any way of getting recompense, um, if they were fired, um, for, you know, noncompliance with the OSHA or VAX or TEST requirement. Here it is quite clear, um, that the employees have, you know, robust remedies in the CSRA scheme, back pay, reinstatement, attorney fees, all the remedies and, and rights and rights to counsel. Um, so I guess that's not entirely responsive, Judge Smith, um, and I'm, I'm sorry, I think we find there's, there's lots of ways to distinguish it, so we don't feel that it's necessary to, to say that, uh, BST Holdings was wrong, but, uh, we do, um, disagree with the proposition that, you know, there's sort of a theory of, of, uh, unconstitutional coercion that applies in this case. Counsel, you argued Elgin and, uh, we've looked at Perry and Kleckner and Fausto and Zummer. I think you also mentioned a recent case from this court. What is your best case involving the CSRA that does not involve an agency action? Um, so Your Honor's right that most of the CSRA cases do involve actual agency actions and that's because usually in employment law, um, people don't sue until they're actually injured. They actually have an employment action. Um, I think some of the best cases, um, Fornaro in the D.C. Circuit is a pretty good case for us in the sense that it rejected the proposition that you have a system-wide challenge, uh, to an OPM policy before it was implemented. Um, some of the other cases, AFGE versus Trump and AFGE versus Air Force, um, are, um, especially helpful. In the AFGE versus Air Force case, um, there was a requirement that, uh, National Guard employees wear their uniforms, uh, while performing, uh, civilian duties and the union wanted to challenge that pre-enforcement. They said, that's no good. It's unlawful for various reasons. Um, and the D.C. Circuit, you know, rebuffed that and said, no, you actually have to wait until you, you know, suffer discipline. So there's a variety of cases that I think support the proposition that pre-enforcement challenges aren't sort of different in kind. And, and the point that I would emphasize, uh, as a backstop to that is you can't disclaim your standing. The standing here of all these plaintiffs is premised upon a possible future injury, which the district court found, you know, with, was imminent with respect to some, maybe not as imminent with respect to others who had pending exemption requests. And you can't just disclaim away your standing and, and say, well, I'm not really challenging employment actions. You are. You're challenging employment actions. You're just trying to challenge them sort of prospectively, um, preemptively, if you will. So those are the primary cases I would refer to. How do you factor in possible mootness in this case? I know it's either moot or it isn't moot, but the argument raised, uh, that this isn't a vaccine. Now, based on, uh, information, I suppose we could take judicial notice, it's not a vaccine. It's a treatment. Even when you're vaccinated, you still have break, breakthrough, uh, cases of COVID and, I mean, there, it's just well known that this is happening. So how, how, it would either be totally, it would be moot and this case would be over or at least it should be something we should consider in going over the factors for whether an injunction is justified. I don't, the case is not moot. The vaccination requirement continues and, um, vaccination continues to be the single best method of preventing serious, you know, disease from COVID, hospitalization and so on and so forth. So I don't, I don't understand how the case, I understand the conditions are changing. Conditions are always changing on the science with the, with the virus and the scientists are always trying to catch up and, you know, the vaccination is always trying to catch up. But that's sort of underscores the need for the president to be the one who has the flexibility to make the adjustments rather than being hamstrung by an injunction that's now in its ninth month, ninth month. Um, the rest of my question was how would that be considered then in the equitable factors for whether an injunction, whether the substantial, uh, uh, basis for substantial prevailing on the merits. How would you factor in the fact that it's a, it's a treatment, not a vaccine? I don't really understand the distinction that you're making on it. I'm not, I just, I don't understand. It's, it's, I mean, it's a vaccination. Yes, it's the, the, the idea behind the vaccination requirement is to mitigate disruptions in the federal workforce, just as many private employers have imposed vaccination requirements. Well, it's true. It is true that CDC guidance in the last month has suggested that against the current variant of, you know, the Omicron, the domino variant of COVID-19, um, the primary series of the vaccination, um, does not do much with respect to transmissibility and affecting other people. Um, but it remains, the CDC has, has made quite clear that it remains very important in terms of mitigating the seriousness of the disease, reducing the risk of hospitalization and death. Following up on what Judge Barksdale said, though, uh, what is the likelihood that the, uh, president would declare that all the employees have to, uh, have to achieve a, a, a, a certain body weight within the next six months? I think the likelihood of that is extraordinarily small, Your Honor. Well, but everyone knows that obesity is one of the biggest problems in the United States and is related to many collateral health problems and death, and that the, the daily consequences of obesity, uh, also affect the workplace in terms of medical costs, absenteeism, and that sort of thing. So it seems to me that obesity is at least as big a problem and it's not transmissible, whereas people who take the vaccine, as you just acknowledged, uh, can still transmit the disease. So what I'm suggesting is that there is no limit to the principle that you're espousing, which is, which I take it to be, that we are requiring federal employees to take the vaccine mostly for their own good. So a couple of response. First, first of all, on the limiting principles idea, um, there, there are significant limits to the president's, um, authority, both, um, legal and, um, political and economic. Um, first, the, the, it's got to have some nexus to federal employment and it's got to promote the efficiency of the service. Um, discipline can only be sustained for any violation of a requirement under 5 U.S.C. 7503 and 7513, um, if it promotes service. And while that may seem like a malleable standard, there's an entire body of law in the Merit Systems Protection Board about what that means. Um, so there are meaningful constraints here. And again, I, I guess the ability to posit- That, that has to be a nexus to the efficiency of the federal workforce. In other words, it has to- Well, obesity has a nexity to the efficiency. I understand, Your Honor, but the ability to posit sort of, um, you know, hypotheticals at the extremes, um, you know, doesn't, um, undercut the government's authority, uh, to, to do something that is squarely within, um- Counsel, I thought on that point though, that at page 26 of your brief, you did elaborate more possible li- limiting principles. So correct me if I'm wrong. Let's just assume a patently unlawful presidential directive that applies to the whole nationwide workforce. Isn't your position that employees might seek pre-enforcement review either through OSC or by mandamus? Yes. Uh, uh, for- Can I test those two? Because am I correct that OSC is never obliged to then in turn petition the MSPB? That's correct. Yes. But that's a little bit of a problem. You might have an explanation, but, and, and on mandamus, if the larger government position is that district courts lack jurisdiction for any pre-enforcement context, how could they in turn issue a writ? So it wouldn't be a district court issuing a writ- Or even the Federal Circuit. It would be the Federal Circuit on the theory that it would have jurisdiction to ultimately review something, you know, uh, an MSB, uh, you know, uh, decision ruling on the validity  Have any case where the Federal Circuit's done that or, or- No, I do not. And again, you know, the government is always reluctant to sort of, uh, pop up with mandamus as a, as a possibility. This is, this is really something that would be reserved for the exceptional case, but we're trying to respond to these sort of the exceptional hypotheticals that are being posited, which are- My first point then, but then I'll stop. Others have their- Yes. What about, what, is it a problem with your theory that OSC doesn't have to, uh, in turn petition the MSPB? I don't think so, Your Honor. And again, this goes back to sort of the threshold point that it, it may well be that there aren't, you know, pre-enforcement, uh, mechanisms to challenge. The whole, you know, CSRA scheme is clearly predicated on sort of post-enforcement review. That's, that's the idea. But to the extent that's the idea, that's what Congress has made the idea and you don't just get to have something else. That's what ELGIN stands for, is that because you don't like the remedies you might get in the CSRA scheme, you know, you can't do a facial constitution. And that, I said last question, but then that does invite extreme, extreme hypotheticals, like a president saying a one-child-only policy. It does invite extreme hypotheticals, Your Honor, but I think those will be resolved pretty quickly either through the CSRA, through the CSRA scheme and, and again, it neglects the sort of meaningful constraints, both political accountability constraints and the, the need to compete against other employers. I mean, this is not just in a vacuum here. The COVID vaccination requirement is something well within the mainstream, you know, 50% of employers at one point, I think, or, or something like that had imposed similar requirements. This is not something out of the mainstream and it's hard enough to retain, you know, qualified, good people in the federal government with the, you know, inability to compete on things like salary. But, you know, the government's just not going to handicap itself by doing something that's outside the mainstream. Counsel. But, so we have to just. The government was following the science, it wasn't following the other businesses. The other businesses thought they were following the science. The argument that the government was just following what business practices seems to me to put the cart before the horse. Counsel. Judge, Judge, can I be clear on that? I don't, I don't say that the government was following the private employers. I'd say the government was motivated by the same science that caused the private employers motivated by their economic interests to do the same things. In other words, this was well within the mainstream. Counsel. Mr. Scarborough, I'm, I'm not quite sure I understand completely your exchange with Judge Higginson with the horrible hypotheticals, the parade of the extreme hypotheticals. You know, for example, and he, I believe he said a one child policy or we could throw out a mandatory birth control for all federal government employees to increase efficiency as possible one. Um, the only, there is not a judicial review, there would not be judicial review, which would be important under Thunder Basin to allow for meaningful judicial review. So how, how does that, so in the birth control, mandatory birth control case, how does that come to mandate to meaningful judicial review? Employee would say, no, I'm not going to do that. And then the president or the agent, relevant agency would take some sort of disciplinary action. It would be reviewed presumably on a highly expedited basis and would be declared unlawful on many, many independent. So it would only be to prevent being fired. It wouldn't be to prevent the policy. And so it might chill much lawful conduct in the meantime. So I guess my answer is that that that's the system that the CSRA sets up is a post enforcement system in the main and you can get meaningful review in that system. And to the extent that there is a question about how that review might be circumscribed, this court's decision in Zummer really says that's, you know, again, it sort of reiterates, you know, and then Judge Roberts' words, you get what you get. But that was in a particular case with a particular employee with a certain situation, not in a particular case. So to the extent that this policy itself is antithetical to personal freedom and choice. So to the extent there are religious liberty interests, which I think sort of certainly is in the background of all this, the process, you know, contemplates requests for exemptions on religious and medical grounds. We're not to that point where that process has been allowed to, you know, take account of individuals, you know, requests for religious exemptions. The whole process was shut down on January 21st, right when it was rearing up to start adjudicating those requests. So we really don't have those, you know, independent constitutional constraints. What we have is a pure claim that the president can't do this with this requirement. And the implications of that are sort of concerning. The limiting principles go both ways in the sense that if, you know, there was an available vaccine that really could, you know, prevent transmissibility and so on and so forth, that the president would be uniquely disabled among all employers from imposing that sort of requirement. Counsel, I'd like to follow up on some of my colleagues' questions about hypotheticals. And I don't want to ask an outlandish hypothetical. I'd like to ask one grounded in an actual executive order that was promulgated in 1997 under this very section, 7301, that the government, as I understand it, grounds its authority, at least in part, in. Yes. In 97, there was an executive order about exposure to tobacco smoke in the workplace. And it prohibited smoking of tobacco products in all interior space in the executive branch of government. So my question is, in your view, in the government's view, would it have been permissible to forbid federal employees from smoking at home, or in other words, to require them to quit smoking altogether, or was, in the government's view, was the authority under 7301 limited to workplace conduct? So my answer is I'm not sure. I think it depends on the nexus, again, the nexus required to the efficiency of the service. There is a long history of presidents regulating both on and off-duty activity. Well, not that one, though. That one is specifically limited to workplace activity. So my question is, could it have extended to off-workplace? And I mean, I think the import is obvious. Here, the vaccination is arguably related to, I guess, workplace transmissibility. But obviously, it extends to non-workplace activity. So the answer, Your Honor, really depends on whether the agency attempting to impose discipline or, you know, have that requirement could show that there was a nexus to the efficiency of the service, that it impacted the agency's operations. That's, again, the body of law that the MSPB applies in deciding. And it's the body of law that this Court applied in the Bonnet decision, where... So if I understand your answer, it could, the agency could do that if it had a basis for thinking that off-workplace smoking had a nexus to workplace activity or workplace efficiency. I think that's right. And in the same sense that, you know, the prohibitions that President Bush imposed on outside financial activities and things like that that conflict with your, you know, your obligations as a government employee. Again, I don't know exactly what the rationale would be for saying you can't smoke outside of the workplace. The rationale inside is pretty clear. I just, I'm not going to rule it out as a possibility because, again, it depends on this nexus requirement that the Merit Systems Protection Board and the Federal Circuit are well-versed in applying. I just want to give you, you know, one example. Back when the air traffic controllers went on strike, there were a series of cases, you know, if you participated in the strike, that's off-duty conduct. Could you potentially be fired for that activity? And, you know, the idea, and the courts, they said yes. The Federal Circuit said yes. And the idea was that, yeah, that actually has an adverse impact on, you know, your performance of federal work obligations. So, I'm sorry the answer's a little bit squishy and maybe unsatisfactory. I mean, I appreciate it. What I hear you saying is there has to be some kind of nexus to employment or to efficiency of the federal, of the civil service. When the State Department orders all of its employees to take certain vaccinations when they go abroad, are they protecting the employee, the people in the countries to which they are sent, or both? I think both, Your Honor. And, again, the rationale, the fact that, you know, keep in mind that when this vaccination requirement was imposed in September, we were dealing with a different variant. And we were dealing with science that showed that there were significant benefits in terms of infection and transmissibility. The rationale certainly extended to don't have people in the federal workplace who are more likely to bring the disease, a deadly disease, into the workplace. That was part of the rationale here. You know, the fact is that the science has changed. There are new variants. And, you know, that particular rationale is somewhat eroded. But there are still significant rationales in play here in terms of preventing serious illness to federal employees, which has a clear nexus to the federal workplace in terms of productivity and efficiency. I see that my time is up. I would like to try to preserve some time for rebuttal unless the Court has any questions, further questions. Thank you. May it please the Court. Trent McConner on behalf of plaintiffs. This Court should affirm the District Court's preliminary injunction in full. Mr. McConner, before we can decide the merits here, we need to determine what claims have actually been made. And reading the brief and the record, I find that to be pretty confusing. So I hope you can help us out. In the in-bank brief that you filed a couple of weeks ago, you said this, I'm quoting, the District Court correctly held that plaintiffs had alleged and proven such ongoing unconstitutional coercion here. You cite record pages 1757 and 1760. I've read those, and they say no such thing. And the government, on the other hand, in its recent brief, said, and I'm quoting, plaintiffs in this case do not claim a violation of their liberty interests or other constitutional freedoms, citing BST holdings, and relying on the 20-page portion of the record, which is your prayer for relief. I've read those 20 pages, and they nowhere even hint at the constitutional violations that you claimed in what I first quoted. And then finally, I will quote from the District Court's opinion, in which Judge Brown said, I'm quoting, the Court does not decide today the ultimate issue of whether the federal worker mandate is lawful. So my question is, what violations of a constitutional nature are you claiming in what's been shown? Because obviously the briefs in the record disagree on that. Yes, Your Honor. So I would point, Your Honor, to the complaint, paragraphs 147 to 158. And there we cite the sort of Damocles coercion. That's paragraph 149. As I take it, that's the same point this Court was making in BST holdings. I would also point to paragraphs 157 to 158, speaking to unrecoverable compliance costs for people who are coerced. As we see it, the chilling effect, the coercion, and the possibility of being vaccinated against someone's will is kind of an extreme form of a compliance cost. Your Honor, I also cited to Judge Brown's irreparable harm decision in Rodham, paragraph 148, where he talked about some of the same issues of BST holdings. I cite to Judge Ho's, I believe it was a dissent at the time, in paragraph 153, about a crisis of conscience as another harm. In our preliminary injunction motion, page 26, we re-raised these arguments. We cite to this Court's irreparable harm analysis from BST holdings, the jobber jab language, Your Honor. And that's why I think the district court was correct to say that we had, in fact, shown unconstitutional coercion. And I would say, even if there were some doubt, I think in BST holdings, the Court established that point kind of as a matter of common sense, a judicially noticeable type fact. So those are the authorities I would point you on to. On jurisdiction writ large, as you said, that is the most important point because it's preliminary, Your Honor. And there are four bases for jurisdiction here. Thunder Basin, the Supreme Court stated, implied preclusion is especially unlikely for the government to put someone to a constitutionally intolerable choice. This Court already held in the BST holdings case that for a government-imposed mandate, at the very least, the jobber jab choice, that is such a constitutionally intolerable choice. In our view, that resolves jurisdiction here straight away. But even if there were some doubt, this is a pre-enforcement challenge to a new government-wide executive regulation. The sort of thing that courts have allowed for decades. I'm referring primarily to the D.C. Circuit cases from the 1980s, joined by then-judges Scalia, Ruth Bader Ginsburg, Robert Bork, Harry Edwards. And contrary to the government's argument, Elgin did not abrogate or overrule those cases. Elgin itself says the question of the CSRA is whether there's a covered employee and a covered adverse action. All Elgin says is once those two boxes are checked, the person's in CSRA world, they're under the CSRA scheme. It didn't address pre-enforcement challenges. The third basis for jurisdiction, text and purpose. CSRA triggers upon a statutory adverse action. The majority panel here agreed that at least for the vast, vast majority of employees, there has been no statutory adverse action. On purpose, Judge Barksdale's dissent at the panel stage had it right. It's quite illogical that Congress would have intended huge separation of powers challenges to be handled, separation of powers challenge to a government-wide regulation to be handled through one-off administrative schemes. The fourth factor for jurisdiction, the Thunder Basin factors. This court held in Cochran the mere risk of being deprived of subsequent judicial review is enough to defeat implied preclusion. Here, for individuals who give in, there's certainly not just a possibility or a risk, but almost a guarantee they will not be able to have judicial review because they won't have suffered a statutorily recognized adverse action. For them, they either need to challenge it now or likely never. Importantly, Cochran stated that these analyses for implied presumption, to overcome them, the government has a very heavy burden, which means if after all of this, you're not quite sure whether there's implied preclusion, then the answer is there isn't because that means the government has not carried its case. On the merits, the President's not a private CEO, obviously. He's bound by the Constitution. In certain cases, he's bound by statutory authority. There is zero historical analog here. Counselor, are you accepting questions? Yes. Before you get to the merits, just so I understand the logic of your argument, would the Elgin plaintiffs, who did seek declaratory and injunctive relief, would they have gotten extra statutory review had they just complained earlier or not? I think it would depend on the type of claim they raised. Your Honor, this is something we addressed in our en banc brief. As Cochran itself said, first of all, they would have to show Article III standing and imminent harm. If they wanted some sort of injunctive relief, they would have to show not just... Well, they wanted injunctive relief against the Selective Service draft registration requirement. So... Sorry? Go ahead. Even if they demonstrate Article III standing with an imminent harm, and if they want an injunction, of course, it will have to be not just a harm but an irreparable harm, even then, as we note in our en banc brief, they would still need to make a claim of some sort of, under the strongest case anyway, some sort of constitutional violation that's ongoing. They didn't allege, as I understand it, any ongoing coercion. So I think they're out under that kind of Thunder Basin intolerable choice analysis. And also, I would point out, and this is something that Judge Costa's dissent, footnote 15 in Cochran talks about, granted not the CSRA context, but it's a general principle, that it might seem unusual for a plaintiff to be able to bring an immediate lawsuit before a kind of bright line triggering action, but it's not so unusual when the statute just talks about things that happen as of that point and afterwards. For things that happen before that point, the presumption would be 1331 jurisdiction. So they would need to have a constitutional claim, probably. But I think the answer, kind of the short answer is, Your Honor, it would depend, but maybe. But that's not necessarily a major loophole, like the government says. It's just a consequence of the way these statutes are often written. On the merits briefly, there's no historical analog for an executive order of this nature. I think that ultimately defeats the government's claim of implied or some sort of inherent Article 2 authority. So they're left with the statutes. I note that the government's own brief repeatedly says the statutes at issue here, this is 3301, 3302, 7301, are narrow in scope. Those are the government's own words. And the district court was faced with essentially two competing interpretations. One that reads conduct of executive branch employees to refer to conduct in the workplace or kind of with a unique tie to the workplace, which was our position. Or the government's position, which was, as they say in their brief to this court, the president can regulate employees' conduct on duty, off duty, not just conduct, but status because they say that's not a distinction. Essentially anything going on in an employee's life. And I think, as Judge Jones' example about obesity points out, and that's certainly not the only one that could be made, the argument that it would improve the efficiency of the service as being the only limitation is not much of a limitation at all. Almost anything could be said to improve the efficiency of the civil service. And so the government then has to try to argue, well actually, this mandate does relate to workplace conduct. I think, unfortunately for them, that argument is foreclosed essentially by the logic of the Supreme Court's decision in the OSHA vaccine case, which said that widespread vaccines and kind of an infectious disease like this that's just commonplace throughout the country is not tied to the workplace. It's not a workplace hazard. In fact, the government's own brief now says they're not worried anymore about workplace spread. They say that's not a basis for the mandate at all. If there's any doubt, again, kind of like with jurisdiction, there's an easy fallback provision, an easy fallback analysis, which would be the major questions doctrine, federalism doctrine, which says if the government's going to assert this kind of great, enormous power that we've never seen before from a statute that is relatively narrow, both in its text and in its historical application, then the government needs to point to clear language in the statute. But they don't have clear language for a vaccine mandate here. And we know, in fact, that Congress knows how to impose vaccine mandates, even in areas where the government or the president could claim inherent Article II power. Section 8 U.S.C. 1182, for example, in the INA, has six or eight references to mandated vaccines. And so if the Congress wanted to give clear language to the president, they certainly have models. On the balance of the harms, again, we think BST Holdings addresses the irreparable harm argument. The district court found other irreparable harms involving the unique employment aspects at issue here. On the other side of the ledger, especially at this point, the government has stated that employees should be treated the same regardless of vaccine status. So as we see it, the government has no harm at all. Mr. McOtter, is there a statute that refers to the State Department requiring vaccinations? I'm not sure, Your Honor. There very well may be. There are some agencies that I believe have clearer language that on some particular context might provide separate authorization. I think in a way, now this didn't involve employees, but the Supreme Court's decision in the CMS case decided the same day as the OSHA vaccine case. The court, they are pointed to statutory language about ensuring the health and safety of individuals at these covered Medicare service centers and said that that was clear enough language there. Obviously, that's a binding decision. There's still nothing even like that as for government employees writ large or under the CSRA, Your Honor. On scope of the injunction, the district court did not abuse its discretion in concluding that only a clear, broad injunction would work here. This court has endorsed that reasoning repeatedly. Louisiana v. Becerra, the Texas DAPA case, the lead plaintiff here has thousands upon thousands of members in every state, almost nearly every agency. As we all know, government employees in particular tend to switch between agencies that might be headquartered in one agency but on detail to another. The only way to ensure that those members receive relief would be to have a clear rule that the government can follow. You don't have to just take my word for that. We know, as I point out in our briefing, that the government lost track of individuals sending them letters saying that they might be suspended even though they had pending religious exemptions, for example. Folks who got letters that said you're going to be fired, oh wait, no you're not, and then it's another letter saying you are, and then that was a mistake. There's a relatively small number of individuals they've had to keep track of and they couldn't even do that. I think that's precisely why the White House's own task force and their guidance documents for this mandate said that uniformity is desired nationwide. None of the other vaccine mandates in my way are where the government made that kind of statement. I think the reason is that the task force, the White House realized it's almost impossible to try to effect one of these vaccine mandates for millions of employees if there are going to be lots of one-off cases, lots of people under certain exceptions depending on whether they're a member, depending on whether they've got an injunction and that sort of thing. So we have a very unique set of circumstances here, even if your honors were concerned about nationwide injunctions generally, this case presents several unique factors. I'd like, if I could, to turn to some of the arguments that my friend on the other side made. He cited Elgin and the fact that it involved a facial statutory challenge. I have a few responses to that. First, remember the plaintiff in Elgin, all the plaintiffs in Elgin, had suffered a consummated prototypical adverse action. They were fired. And the Supreme Court says, again, that the case really turns on the fact that they had that adverse action and that they were covered employees. It didn't really matter after that as to what theory they might come up with for why their termination was improper. Second, I think this is an argument maybe alluded to a little bit in Judge Parkstale's dissent at the panel stage. Elgin did involve a challenge to a statute that had been around for, I believe, 70 years at the time whereas our case involves a challenge to a new unilateral executive order. And I think there's at least an argument to be made that there's a distinction there if we're trying to figure out what Congress might consider to be impliedly precluded. I don't think the court needs to reach it, but I do think it's an extra factor for us. It seems less likely that Congress would want to impliedly preclude every yet-to-be-formulated, who-knows-how-crazy executive order that might come out as opposed to a statute that Congress itself wrote 70 years ago. On Zummer, which is a recent case from this court, the government cited that. Again, I view it as actually an even easier case than Elgin. The plaintiff, as I understood it in that case, had a consummated adverse action opinion says that he'd been removed from his position. So he was under Elgin and under the CSR scheme at that point. But then he also had the fact that his removal turned on a security clearance determination, which, of course, under Regan, the courts generally can't review at all. So in our view, he was kind of twice over precluded from trying to bring a case to the court. I think that there's certainly not a rigid framework, Your Honor. I think that the . . . I can't remember which case said it. It may have been one of this court's cases. I think the court has said that the lack of judicial review is the most important of them. And so I think that if the case is not reviewed, then it's not a rigid framework. If the case kind of turns on that particular factor and the others are less relevant, then that can decide implied preclusion one way or the other. I think you might see that a little bit in Elgin itself, where the court focuses a lot on the availability of judicial review. It's the same in Cochran, in particular. And then kind of at the very end, you get to does the agency have expertise in this area? And, of course, for the reasons in our brief, we think we went on all the factors. So it doesn't particularly matter whether one's more important. Your Honor. I don't want to ask too many questions, but at the moment you're not getting other questions, so I'll ask you a few more. Could you tell us . . . do you have any separate critique of the Fourth Circuit's RIVI decision, or would it be identical to this? Number one. And then my second legal question is, in the brief, you do rely heavily on Cochran and FIV. Then by 28J, it's West Virginia and the majority court doctrine. Would you say each of those latter three on the merits stands independently, or are you urging one as more compelling? Do you understand my question? I think I do, but what were the three cases again? Sorry. Cochran, West Virginia. And FIV, West Virginia. The first question, RIVI, the Fourth Circuit's decision, the reason why I don't think it's particularly helpful here, there are actually two. First, it didn't address the ongoing coercion argument that we make, which is based on language from Thunder Basin. This court said the same thing in Cochran, page 206. You can look for the Ex Parte Young site there. The Fourth Circuit never addresses that period. And so, as I've said, that's, I think, an independent basis for jurisdiction. The Fourth Circuit never reached it. As for the part that the Fourth Circuit did reach, it relies a lot on this OSC route, Your Honor, the 2302 provision. And the court's analysis there is flawed because when it tries to decide whether there's been a prohibited personnel practice that OSC can review under Section 1214, it looks to 2302, which defines those practices. And it points to B-12, which is the same one that the panel majority here cited to. It says if there's a personnel action that violates a law, rule, or regulation implementing a separate principle from Section 2301, then that can be a prohibited practice. The problem is the Fourth Circuit cut it off at law, rule, or regulation. And so it said, well, the plaintiffs argue there's a constitutional violation. The Constitution is a law. And so this is a prohibited personnel practice. But the statute says it needs to be a law, rule, or regulation implementing a 2301 principle. And so if you go to 2301, it refers to the constitutional rights generally, but there's no separate implementation. And so the point is, there's a prohibited personnel practice that OSC can review under 2302 B-12 only when there's a separate law, rule, or regulation implementing a constitutional provision. No one's ever pointed to any such implementation. There's no special rule, law, or regulation that says when the government considers whether to do mandates or vaccines or anything like that, it needs to consider constitutional concerns. So I realize it's a little complicated, but the Fourth Circuit essentially cut off that statute too early, and that made it too easy for them to find that there's a prohibited personnel practice that OSC could review. Those are the two problems, the two primary problems with writing. On the second part of your question about Cochran, NFIB, West Virginia, I think Cochran, being an en banc decision of this Court, is the one that the Court should look to the most. It obviously did not involve the CSRA. None of these decisions did, but it lays out a lot of the basic presumptions. For example, that the government has a very strong burden, a heavy burden to show implied preclusion. It laid out the framework in a useful way, I think, and I tried to mimic it a little bit in my brief in terms of following statutory text, looking at precedent, looking at Thunder Basin factors, considering all available options. Cochran also has a lot of useful statements that I've kind of worked into my brief about these frameworks. NFIB, obviously, is useful on, I think, the particular point of, first of all, does the major questions doctrine apply to a government-imposed vaccine mandate? Yes, that's what NFIB says, and then also the reason it's useful is on the point of whether a vaccine mandate or the possibility of a spread of a disease that's kind of ubiquitous throughout the country, whether that is something that's tied to the workplace, which is very relevant to the 7301 question here, Your Honor, as to whether the authority that's been given to the President under 7301 would cover something that is not really tied to the workplace. Mr. McOtter, just turning from the merits to relief, does it necessarily follow that a nationwide executive order justifies or warrants nationwide relief? No, I don't think that it's certainly not a necessary thing, and I don't think the district court held that. This is not one of those cases where the district court said it applies nationwide, the mandate, so it wouldn't be nice if the relief were nationwide. This court said, as I understand it, in Louisiana v. Becerra, no, that's wrong. What the district court needs to say is there's something unusual about this case. There's something that makes it difficult to ensure that all the plaintiffs and their members would receive relief, but for a clear, broad rule. And remember, in this case, it's not just 6,000 or more members of this membership plaintiff, but also on the flip side, we've got, I think, 25 or so federal agencies, almost every single one in the federal government, and so when you put all these things together, it's so many employees at so many agencies in so many states, moving across states, moving across countries in some circumstances, moving between agencies. The district court pointed to that as the practicality problem, and the government tries to frame this as some sort of exception, to say, well, there's no exception for, it would just be difficult to narrowly tailor relief. But I think that frames it the wrong way. As this court said in Becerra and in the Texas DAFA case, the question for injunction, because it's an equitable relief, equitable remedy, is whether the court can ensure relief to all the named plaintiffs and their members. And sometimes it will be the case that the only way to do that is to be a little bit overbroad. That's the nature of a nationwide injunction, is the nature of a case like this. Counsel, of course, you're well aware of the prudential rule that we avoid constitutional issues if there's another basis for deciding a case. Tied in with the change in, I'll use the term, science, concerning whether this is a vaccine or whether this is a treatment, the government says it doesn't understand how this case could be moot in the light of that. How do you address the change in what we could take judicial notice of concerning the viability of the vaccine? Where would you apply that? Would you apply it to the idea of mootness? Would you apply it to the substantial likelihood of success on the merits? Where would you place it? I think it's probably relevant to a couple factors, Your Honor. It probably goes to the President's Article 2 power question. If this is something that hasn't been seen before, my understanding is that it's a gene therapy treatment not necessarily a vaccine. So even if the government had some historical evidence of vaccine mandates, which they don't, but even if they did, that could be a distinguishing factor. I think on the equitable portion, the harms and whatnot, Your Honor, it's certainly the case the government more recently has said that employees should be treated the same regardless of their status one way or the other. I don't think that that necessarily moots the case because the government has said it's a pause it's not an actual change. And even if it were, it would probably be voluntary cessation. And so I think that the fact that we know more about the vaccines, it's relevant in those factors it's also relevant to the harm the government claims it's facing and we've seen this because they've essentially abandoned their argument that workplace spread is a basis for the vaccine mandate here. They've exclaimed that as I understand it expressly. I think perhaps after the Supreme Court's NFIB decision they had no choice but to do so. That also shows that the only concern, the only stated basis that the government has now is this sort of nanny state argument that the government just knows better than employees how to deal with their health and it's tied to something that isn't even, according to the Supreme Court President tethered to workplace status or employment conditions at all. It's really something that's ubiquitous. So I think, if I'm understanding Your Honor's questions, I think it could factor in a couple different other elements. If I could continue going through some of the cases the government cited, it cites repeatedly the Fornero case. This was written by then Judge Roberts when he was on the D.C. Circuit. I think that the quote the government keeps pulling out, which is what you get under CSRA is what you get, they leave out the first half of that sentence which is for acts that are within the CSRA. That's not a direct quote, but it's essentially what the first part of that sentence says. So when the government gives that quote, it's kind of question begging because it's presuming that the claims here are within the CSRA and therefore once you're in the CSRA what you see is what you get. The problem of course, these claims aren't within the CSRA. On BST holdings that Judge Smith asked about to the government, again, we think that BST applies to the jurisdictional question because it confirms ongoing coercion. I think it also applies to irreparable harm for essentially the same reason. DOJ's brief doesn't challenge BST's holdings. BST holdings decision here and the government tries to distinguish it a few ways primarily on the theory that that involved private employees not government employees like we have here. Again, that kind of begs the question on whether there's CSRA relief, but even setting that aside the irreparable harm analysis in BST holdings turned on who was doing the coercion. It was the government doing it. It didn't turn on whether these were private employees or whether they had some other scheme. The opinion says nothing of that sort. Of course, one of the things the government elides in its analysis here is that in the OSHA vaccine case it argued at the Supreme Court that there's no irreparable harm because employees can simply employees and employers can simply refuse to follow it. If they get fined, they can challenge it through the administrative process set out under the OSH Act. It's a similar argument here. They're saying just incur the fine, just incur the penalties and you can address it on the back end. This court didn't address that, didn't adopt it. The Supreme Court certainly did not adopt that argument. I'll also point out the government's own brief says that private employees might have their own relief that would have been relevant as a backup scheme for the OSHA vaccine mandate. That is, they might have Title VII recourse. I realize there's a disagreement among some of the judges of this court on that question. It was discussed in San Bruno, but of course our court need not address that. Excuse me, the court need not address that in our case because we have government employees. Everyone, I think, agrees that when the government does it, that's the irreparable harm regardless of when a private party does it. On what the government called the extreme hypotheticals, I take it this is about Section 7301, the President's power to set regulations relating to conduct. I don't think a lot of the examples that were given are so extreme. I think a lot of folks would have said that a vaccine mandate might seem extreme, or at least might seem unlikely to come out from executive order. In fact, I believe the President has said that he wouldn't do one. But again, the point isn't so much whether we think that the President will do it politically. Those aren't really legal doctrines that cabin the statutory text or cabin the President's authority. The question is does it relate to conduct that has a workplace connection or some connection to employment status? The district court correctly found that it did not. On one last point before my time expires, on mandamus, the government proffers this mandamus route as a possible option. Of course, for that to trigger, there would need to be a CSRA adverse action in the first place, or else no court under the government's theory would have jurisdiction until then. And as I point out in my brief, given the unique way in which this mandate was issued, directly by a President, not by an agency, that would mean a court, even if a court could hear it, issuing injunction against the President directly, which the Supreme Court said 160 years ago is a frivolous endeavor. Now it doesn't mean that courts couldn't ever do it, but every court has shied away from that. So I don't think the mandamus route is a viable alternative. Unless the court has any further questions, we will ask that the court affirm the PI in full. Thank you. Just a few quick points. I realize my time is limited. On this ongoing constitutional coercion theory, that's basically the way plaintiffs are trying to get out and distinguish this case. They're basically trying to ignore the fact that their standing is predicated upon the threat of future removal or disciplinary action that is clearly cognizable in the CSRA, and saying, no, no, our injury is something else. That's not right for some of the reasons that Judge Smith has at least suggested, and that there is no constitutional claim articulated here, and that whatever coercion is occurring here is just like the coercion from any sort of condition of employment. It's especially strange to be asserting an ongoing coercion theory in a system that allows for individualized exemptions for religious and medical exceptions. So this is just a way to go through the CSRA scheme. On Judge Higginson, you asked the question about would the result have been any different for the Elgin plaintiffs if one of those plaintiffs had not actually been disciplined, but had sort of had the foresight to sue in advance of his difference, in advance of his discipline. I'm not sure you got an answer, but that's part of our point, is that I don't think there's any indication from Elgin that if someone had come in and said, I think I'm going to be disciplined for and it would sort of give a unique pass to the person whose injury is the most speculative, because they don't actually know. So that sort of puts things on their head. Let me just ask you, since you didn't allude to it in your opening argument, is it your contention that all those decisions that came up in the 80s that involved pre-enforcement challenges to workplace regulations were just wiped away by Elgin? Yeah, I think they were operating under a different regime. They were pre-Fausto which was 1988 where the Supreme Court announced sort of the way the CSRA has a wider preclusive effect, and certainly pre-Elgin. But they're still cited. I mean, those have been cited in our court more recently, right? I don't believe so, Your Honor. 1989. Yes, the last case in this court was the NTEEU versus Bush case. That has no discussion of CSRA preclusion. It is review of the Reagan-era drug testing. I give you that. But it doesn't discuss CSRA preclusion. It's not a jurisdictional holding of any sort. And our point is the cases from the late 80s are really operating under a different scheme. They're operating at different assumptions about CSRA preclusion that just have been abandoned. The Rydie Court explained that. There's a decision not. But we've always been taught, we have been adjured by the Supreme Court on . . . well, they're D.C. Circuit cases. Never mind. They are D.C. Circuit cases, and the D.C. Circuit has in various ways suggested that it's pulling back. There's a case in D.D.C. called Payne that's actually going up on appeal. It's a civilian vax mandate case. That's not the D.C. Circuit. It's not the D.C. Circuit. I'm saying it's a D.D.C. case. I'm sorry if I was inaccurate. You did say that. I'm just saying. Okay. That's correct. But it's going up. Where do you see the D.C. Circuit suggesting that it's 1980s decisions on pre-enforcement are not precluded by . . . It's definitely moved away from them in the AFTE versus Trump case and the AFTE versus Air Force case. The whole tenor of the discussion for NARA is incompatible with the notion that you can get some sort of pre-enforcement challenge. Before your time elapses, could you just address NFIB? Are you saying that 7301 is in the . . . both has textually broader language in conduct and contextually it's in the shadow of Article II and it's talking about the government as an employer, not a regulator? How do you distinguish NFIB? Yes. The statutory language is different. It's not statutory language on the OSHA Act. What was talked about, workplace conduct. 7301 is not limited to workplace conduct. And yes, it's absolutely in the  federal task force and the federal government. And I think that's really very important here. You're not talking, again, about a delegation of authority to an agency. You're talking about the president exercising Article II authority, which is confirmed and buttressed by congressional delegations of authority, which is sort of where the authority would be at its zenith, really. I just had one other point to make, if I may. There's been a lot of discussion about how the SAFER federal task force wants uniformity and needs uniformity and therefore that somehow justifies the broad scope of the injunction here. I would just point out that the process that was set up, yes, we want to be uniform and consistent in treating federal employees, but it allows for tailored exemptions. It allows for individualized exemptions for medical and religious claims. So necessarily you're going to have some variance here and you could have variance that accounts for the members of Feds for Medical Freedom as well. Unless the court has any further questions, thank you for your time. Thank you, counsel. The court will take a brief recess.